PARAMOUNT COMMUNICATIONS, INC. and KDS Acquisitions Corp., Plaintiffs Below, Appellants,

v.

TIME INCORPORATED, T.W. Sub, James F. Bere, Henry C. Goodrich, Clifford J. Grum, Matina S. Horner, David T. Kearns, Gerald M. Levin, J. Richard Munro, N.J. Nicholas, Jr., Donald S. Perkins, Clifton R. Wharton, Michael D. Finkelstein, Henry Luce III, Jason D. McManus, John R. Opel, and Warner Communications, Inc., Defendants Below, Appellees.

LITERARY PARTNERS, L.P., Cablevision Media Partners, L.P., and A. Jerrold Perenchio, Plaintiffs Below, Appellants,

v.

TIME INCORPORATED, TW Sub Inc., James F. Bere, Michael D. Dingman, Edward S. Finkelstein, Matina S. Horner, David T. Kearns, Gerald M. Levin, Henry Luce III, Jason D. McManus, J. Richard Munro, N.J. Nicholas, Jr., John R. Opel, Donald S. Perkins, and Warner Communications, Inc., Defendants Below, Appellees.

### In re TIME INCORPORATED SHAREHOLDER LITIGATION.

Supreme Court of Delaware.

Submitted: July 24, 1989.
Decided: July 24, 1989.
Written Opinion: Feb. 26, 1990.
Revised: March 9, 1990.

Melvyn L. Cantor (argued) of Simpson Thacher & Bartlett, New York City, Bruce M. Stargatt, David C. McBride, Josy W. Ingersoll, and Jan R. Jurden of Young, Conaway, Stargatt & Taylor, Wilmington, for Paramount Communications, Inc. and KDS Acquisition Corp., appellants.

Michael R. Klein (argued), Richard W. Cass, Thomas W. Jeffrey, and Eric R. Markus of Wilmer, Cutler & Pickering, Washington, D.C., P. Clarkson Collins, Jr., Lewis H. Lazarus, and Barbara M. MacDonald of Morris, James, Hitchens & Williams, Wilmington, for Literary Partners, L.P., Cablevision Media Partners, L.P., and A. Jerrold Perenchio, appellants.

Robert D. Joffe (argued) of Cravath, Swaine & Moore, New York City, Martin P. Tully, Thomas R. Hunt, Jr., Lawrence A. Hamermesh, and Palmer L. Whisenant of Morris, Nichols, Arsht & Tunnell, Wilmington, for Time Inc., TW Sub Inc. and the Individual Director defendants, appellees.

Herbert M. Wachtell (argued), William C. Sterling, Jr., Peter C. Hein, Kenneth B. Forrest, Barbara Robbins, Andrew C. Houston, Benjamin E. Rosenberg, and George T. Conway III of Wachtell, Lipton, Rosen & Katz, New York City, Charles F. Richards, Jr., William J. Wade, Thomas A. Beck, Gregory V. Varallo, Daniel A. Dreisbach, Michael J. Feinstein, and William P. Bowden of Richards, Layton & Finger, Wilmington, for Warner Communications Inc., appellee.

Stuart H. Savett (argued) of Kohn Savett Klein & Graff, P.C., Philadelphia; Henry A. Heiman and Gary W. Aber of Heiman, Aber & Goldlust, Wilmington, Berger & Montague, P.C., of counsel, Philadelphia, for Shareholder plaintiffs.

Before HORSEY, MOORE and HOLLAND, JJ.

HORSEY, Justice:

Paramount Communications, Inc. ("Paramount") and two other groups of plain-

**1142**

tiffs [1] ("Shareholder Plaintiffs"), shareholders of Time Incorporated ("Time"), a Delaware corporation, separately filed suits in the Delaware Court of Chancery seeking a preliminary injunction to halt Time's tender offer for 51% of Warner Communication, Inc.'s ("Warner") outstanding shares at $70 cash per share. The court below consolidated the cases and, following the development of an extensive record, after discovery and an evidentiary hearing, denied plaintiffs' motion. In a 50–page unreported opinion and order entered July 14, 1989, the Chancellor refused to enjoin Time's consummation of its tender offer, concluding that the plaintiffs were unlikely to prevail on the merits. *In re Time Incorporated Shareholder Litigation*, Del.Ch., C.A. No. 10670, Allen, C., 1989 WL 79880 (July 14, 1989).

On the same day, plaintiffs filed in this Court an interlocutory appeal, which we accepted on an expedited basis. Pending the appeal, a stay of execution of Time's tender offer was entered for ten days, or until July 24, 1989, at 5:00 p.m. Following briefing and oral argument, on July 24 we concluded that the decision below should be affirmed. We so held in a brief ruling from the bench and a separate Order entered on that date. The effect of our decision was to permit Time to proceed with its tender offer for Warner's outstanding shares. This is the written opinion articulating the reasons for our July 24 bench ruling. 565 A.2d 280, 281.

The principal ground for reversal, asserted by all plaintiffs, is that Paramount's June 7, 1989 uninvited all-cash, all-shares, "fully negotiable" (though conditional) tender offer for Time triggered duties under *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985), and that Time's board of directors, in responding to Paramount's offer, breached those duties. As a consequence, plaintiffs argue that in our review of the Time board's decision of June 16, 1989 to enter into a revised merger agreement with Warner, Time is not entitled to the benefit and protection of the business judgment rule.

Shareholder Plaintiffs also assert a claim based on *Revlon v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986). They argue that the original Time–Warner merger agreement of March 4, 1989 resulted in a change of control which effectively put Time up for sale, thereby triggering *Revlon* duties. Those plaintiffs argue that Time's board breached its *Revlon* duties by failing, in the face of the change of control, to maximize shareholder value in the immediate term.

Applying our standard of review, we affirm the Chancellor's ultimate finding and conclusion under *Unocal*. We find that Paramount's tender offer was reasonably perceived by Time's board to pose a threat to Time and that the Time board's "response" to that threat was, under the circumstances, reasonable and proportionate. Applying *Unocal*, we reject the argument that the only corporate threat posed by an all-shares, all-cash tender offer is the possibility of inadequate value.

We also find that Time's board did not by entering into its initial merger agreement with Warner come under a *Revlon* duty either to auction the company or to maximize short-term shareholder value, notwithstanding the unequal share exchange. Therefore, the Time board's original plan of merger with Warner was subject only to a business judgment rule analysis. *See Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 873–74 (1985).[2]

---

**1.** Plaintiffs in these three consolidated appeals are: (i) Paramount Communications, Inc. and KDS Acquisition Corp. (collectively "Paramount"); (ii) Literary Partners L.P., Cablevision Media Partners, L.P., and A. Jerrold Perenchio (collectively "Literary Partners"), suing individually; and (iii) certain other shareholder plaintiffs, suing individually and as an uncertified class.

**2.** In the specific context of a proposed merger of domestic corporations, a director has a duty under 8 *Del.C.* § 251(b), along with his fellow directors, to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. Certainly in the merger context, a director may not abdicate that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement. *See Beard v. Elster*, Del.Supr., 160 A.2d 731, 737 (1960). Only an agreement of merger satisfying the require-

## I

Time is a Delaware corporation with its principal offices in New York City. Time's traditional business is publication of magazines and books; however, Time also provides pay television programming through its Home Box Office, Inc. and Cinemax subsidiaries. In addition, Time owns and operates cable television franchises through its subsidiary, American Television and Communication Corporation. During the relevant time period, Time's board consisted of sixteen directors. Twelve of the directors were "outside," nonemployee directors. Four of the directors were also officers of the company. The outside directors included: James F. Bere, chairman of the board and CEO of Borg–Warner Corporation (Time director since 1979); Clifford J. Grum, president and CEO of Temple–Inland, Inc. (Time director since 1980); Henry C. Goodrich, former chairman of Sonat, Inc. (Time director since 1978); Matina S. Horner, then president of Radcliffe College (Time director since 1975); David T. Kearns, chairman and CEO of Xerox Corporation (Time director since 1978); Donald S. Perkins, former chairman of Jewel Companies, Inc. (Time director since 1979); Michael D. Dingman, chairman and CEO of The Henley Group, Inc. (Time director since 1978); Edward S. Finkelstein, chairman and CEO of R.H. Macy & Co. (Time director since 1984); John R. Opel, former chairman and CEO of IBM Corporation (Time director since 1984); Arthur Temple, chairman of Temple–Inland, Inc. (Time director since 1983); Clifton R. Wharton, Jr., chairman and CEO of Teach-ers Insurance and Annuity Association— College Retirement Equities Fund (Time director since 1982); and Henry R. Luce III, president of The Henry Luce Foundation, Inc. (Time director since 1967). Mr. Luce, the son of the founder of Time, individually and in a representative capacity controlled 4.2% of the outstanding Time stock. The inside officer directors were: J. Richard Munro, Time's chairman and CEO since 1980: N.J. Nicholas, Jr., president and chief operating officer of the company since 1986; Gerald M. Levin, vice chairman of the board; and Jason D. McManus, editor-in-chief of *Time* magazine and a board member since 1988.[3]

As early as 1983 and 1984, Time's executive board began considering expanding Time's operations into the entertainment industry. In 1987, Time established a special committee of executives to consider and propose corporate strategies for the 1990s. The consensus of the committee was that Time should move ahead in the area of ownership and creation of video programming. This expansion, as the Chancellor noted, was predicated upon two considerations: first, Time's desire to have greater control, in terms of quality and price, over the film products delivered by way of its cable network and franchises; and second, Time's concern over the increasing globalization of the world economy. Some of Time's outside directors, especially Luce and Temple, had opposed this move as a threat to the editorial integrity and journalistic focus of Time.[4] Despite this concern, the board recognized that a

ments of 8 *Del.C.* § 251(b) may be submitted to the shareholders under § 251(c). *See generally Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811–13 (1984); *see also Pogostin v. Rice,* Del.Supr., 480 A.2d 619 (1984). *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 873 (footnote omitted).

3. Four directors, Arthur Temple, Henry C. Goodrich, Clifton R. Wharton, and Clifford J. Grum, have since resigned from Time's board. The Chancellor found, with the exception of Temple, their resignations to reflect more a willingness to step down than disagreement or dissension over the Time–Warner merger. Temple did not choose to continue to be associated with a corporation that was expanding into the enter-tainment field. Under the board of the combined Time–Warner corporation, the number of Time directors, as well as Warner directors, was limited to twelve each.

4. The primary concern of Time's outside directors was the preservation of the "Time Culture." They believed that Time had become recognized in this country as an institution built upon a foundation of journalistic integrity. Time's management made a studious effort to refrain from involvement in Time's editorial policy. Several of Time's outside directors feared that a merger with an entertainment company would divert Time's focus from news journalism and threaten the Time Culture.

vertically integrated video enterprise to complement Time's existing HBO and cable networks would better enable it to compete on a global basis.

In late spring of 1987, a meeting took place between Steve Ross, CEO of Warner Brothers, and Nicholas of Time. Ross and Nicholas discussed the possibility of a joint venture between the two companies through the creation of a jointly-owned cable company. Time would contribute its cable system and HBO. Warner would contribute its cable system and provide access to Warner Brothers Studio. The resulting venture would be a larger, more efficient cable network, able to produce and distribute its own movies on a worldwide basis. Ultimately the parties abandoned this plan, determining that it was impractical for several reasons, chief among them being tax considerations.

On August 11, 1987, Gerald M. Levin, Time's vice chairman and chief strategist, wrote J. Richard Munro a confidential memorandum in which he strongly recommended a strategic consolidation with Warner. In June 1988, Nicholas and Munro sent to each outside director a copy of the "comprehensive long-term planning document" prepared by the committee of Time executives that had been examining strategies for the 1990s. The memo included reference to and a description of Warner as a potential acquisition candidate.

Thereafter, Munro and Nicholas held meetings with Time's outside directors to discuss, generally, long-term strategies for Time and, specifically, a combination with Warner. Nearly a year later, Time's board reached the point of serious discussion of the "nuts and bolts" of a consolidation with an entertainment company. On July 21, 1988, Time's board met, with all outside directors present. The meeting's purpose was to consider Time's expansion into the entertainment industry on a global scale. Management presented the board with a profile of various entertainment companies

in addition to Warner, including Disney, 20th Century Fox, Universal, and Paramount.

Without any definitive decision on choice of a company, the board approved in principle a strategic plan for Time's expansion. The board gave management the "go-ahead" to continue discussions with Warner concerning the possibility of a merger. With the exception of Temple and Luce, most of the outside directors agreed that a merger involving expansion into the entertainment field promised great growth opportunity for Time. Temple and Luce remained unenthusiastic about Time's entry into the entertainment field. *See supra* note 2.

The board's consensus was that a merger of Time and Warner was feasible, but only if Time controlled the board of the resulting corporation and thereby preserved a management committed to Time's journalistic integrity. To accomplish this goal, the board stressed the importance of carefully defining in advance the corporate governance provisions that would control the resulting entity. Some board members expressed concern over whether such a business combination would place Time *"in play."* The board discussed the wisdom of adopting further defensive measures to lessen such a possibility.[5]

Of a wide range of companies considered by Time's board as possible merger candidates, Warner Brothers, Paramount, Columbia, M.C.A., Fox, MGM, Disney, and Orion, the board, in July 1988, concluded that Warner was the superior candidate for a consolidation. Warner stood out on a number of counts. Warner had just acquired Lorimar and its film studios. Time–Warner could make movies and television shows for use on HBO. Warner had an international distribution system, which Time could use to sell films, videos, books and magazines. Warner was a giant in the music and recording business, an area into which Time wanted to expand. None of

---

**5.** Time had in place a panoply of defensive devices, including a staggered board, a "poison pill" preferred stock rights plan triggered by an acquisition of 15% of the company, a fifty-day notice period for shareholder motions, and restrictions on shareholders' ability to call a meeting or act by consent.

the other companies considered had the musical clout of Warner. Time and Warner's cable systems were compatible and could be easily integrated; none of the other companies considered presented such a compatible cable partner. Together, Time and Warner would control half of New York City's cable system; Warner had cable systems in Brooklyn and Queens; and Time controlled cable systems in Manhattan and Queens. Warner's publishing company would integrate well with Time's established publishing company. Time sells hardcover books and magazines, and Warner sells softcover books and comics.[6] Time–Warner could sell all of these publications and Warner's videos by using Time's direct mailing network and Warner's international distribution system. Time's network could be used to promote and merchandise Warner's movies.

In August 1988, Levin, Nicholas, and Munro, acting on instructions from Time's board, continued to explore a business combination with Warner. By letter dated August 4, 1988, management informed the outside directors of proposed corporate governance provisions to be discussed with Warner. The provisions incorporated the recommendations of several of Time's outside directors.

From the outset, Time's board favored an all-cash or cash and securities acquisition of Warner as the basis for consolidation. Bruce Wasserstein, Time's financial advisor, also favored an outright purchase of Warner. However, Steve Ross, Warner's CEO, was adamant that a business combination was only practicable on a stock-for-stock basis. Warner insisted on a stock swap in order to preserve its shareholders' equity in the resulting corporation. Time's officers, on the other hand, made it abundantly clear that Time would be the acquiring corporation and that Time would control the resulting board. Time refused to permit itself to be cast as the "acquired" company.

Eventually Time acquiesced in Warner's insistence on a stock-for-stock deal, but talks broke down over corporate governance issues. Time wanted Ross' position as a co-CEO to be temporary and wanted Ross to retire in five years. Ross, however, refused to set a time for his retirement and viewed Time's proposal as indicating a lack of confidence in his leadership. Warner considered it vital that their executives and creative staff not perceive Warner as selling out to Time. Time's request of a guarantee that Time would dominate the CEO succession was objected to as inconsistent with the concept of a Time–Warner merger "of equals." Negotiations ended when the parties reached an impasse. Time's board refused to compromise on its position on corporate governance. Time, and particularly its outside directors, viewed the corporate governance provisions as critical for preserving the "Time Culture" through a pro-Time management at the top. See supra note 4.

Throughout the fall of 1988 Time pursued its plan of expansion into the entertainment field; Time held informal discussions with several companies, including Paramount. Capital Cities/ABC approached Time to propose a merger. Talks terminated, however, when Capital Cities/ABC suggested that it was interested in purchasing Time or in controlling the resulting board. Time steadfastly maintained it was not placing itself up for sale.

Warner and Time resumed negotiations in January 1989. The catalyst for the resumption of talks was a private dinner between Steve Ross and Time outside director, Michael Dingman. Dingman was able to convince Ross that the transitional nature of the proposed co-CEO arrangement did not reflect a lack of confidence in Ross. Ross agreed that this course was best for the company and a meeting between Ross and Munro resulted. Ross agreed to retire in five years and let Nicholas succeed him. Negotiations resumed and many of the details of the original stock-for-stock exchange agreement re-

---

6. In contrast, Paramount's publishing endeavors were in the areas of professional volumes and text books. Time's board did not find Para-

mount's publishing as compatible as Warner's publishing efforts.

mained intact. In addition, Time's senior management agreed to long-term contracts.

Time insider directors Levin and Nicholas met with Warner's financial advisors to decide upon a stock exchange ratio. Time's board had recognized the potential need to pay a premium in the stock ratio in exchange for dictating the governing arrangement of the new Time–Warner. Levin and outside director Finkelstein were the primary proponents of paying a premium to protect the "Time Culture." The board discussed premium rates of 10%, 15% and 20%. Wasserstein also suggested paying a premium for Warner due to Warner's rapid growth rate. The market exchange ratio of Time stock for Warner stock was .38 in favor of Warner. Warner's financial advisors informed its board that any exchange rate over .400 was a fair deal and any exchange rate over .450 was "one hell of a deal." The parties ultimately agreed upon an exchange rate favoring Warner of .465. On that basis, Warner stockholders would have owned approximately 62%[7] of the common stock of Time–Warner.

On March 3, 1989, Time's board, with all but one director in attendance, met and unanimously approved the stock-for-stock merger with Warner. Warner's board likewise approved the merger. The agreement called for Warner to be merged into a wholly-owned Time subsidiary with Warner becoming the surviving corporation. The common stock of Warner would then be converted into common stock of Time at the agreed upon ratio. Thereafter, the name of Time would be changed to Time–Warner, Inc.

The rules of the New York Stock Exchange required that Time's issuance of shares to effectuate the merger be approved by a vote of Time's stockholders. The Delaware General Corporation Law required approval of the merger by a majority of the Warner stockholders. Delaware law did not require any vote by Time stockholders. The Chancellor concluded that the

agreement was the product of "an arms-length negotiation between two parties seeking individual advantage through mutual action."

The resulting company would have a 24–member board, with 12 members representing each corporation. The company would have co-CEO's, at first Ross and Munro, then Ross and Nicholas, and finally, after Ross' retirement, by Nicholas alone. The board would create an editorial committee with a majority of members representing Time. A similar entertainment committee would be controlled by Warner board members. A two-thirds supermajority vote was required to alter CEO successions but an earlier proposal to have supermajority protection for the editorial committee was abandoned. Warner's board suggested raising the compensation levels for Time's senior management under the new corporation. Warner's management, as with most entertainment executives, received higher salaries than comparable executives in news journalism. Time's board, however, rejected Warner's proposal to equalize the salaries of the two management teams.

At its March 3, 1989 meeting, Time's board adopted several defensive tactics. Time entered an automatic share exchange agreement with Warner. Time would receive 17,292,747 shares of Warner's outstanding common stock (9.4%) and Warner would receive 7,080,016 shares of Time's outstanding common stock (11.1%). Either party could trigger the exchange. Time sought out and paid for "confidence" letters from various banks with which it did business. In these letters, the banks promised not to finance any third-party attempt to acquire Time. Time argues these agreements served only to preserve the confidential relationship between itself and the banks. The Chancellor found these agreements to be inconsequential and futile attempts to "dry up" money for a hostile takeover. Time also agreed to a "no-shop" clause, preventing Time from considering any other consolidation proposal, thus relin-

---

**7.** As was noted in the briefs and at oral argument, this figure is somewhat misleading because it does not take into consideration the number of individuals who owned stock in both companies.

quishing its power to consider other proposals, regardless of their merits. Time did so at Warner's insistence. Warner did not want to be left "on the auction block" for an unfriendly suitor, if Time were to withdraw from the deal.

Time's board simultaneously established a special committee of outside directors, Finkelstein, Kearns, and Opel, to oversee the merger. The committee's assignment was to resolve any impediments that might arise in the course of working out the details of the merger and its consummation.

Time representatives lauded the lack of debt to the United States Senate and to the President of the United States. Public reaction to the announcement of the merger was positive. Time–Warner would be a media colossus with international scope. The board scheduled the stockholder vote for June 23; and a May 1 record date was set. On May 24, 1989, Time sent out extensive proxy statements to the stockholders regarding the approval vote on the merger. In the meantime, with the merger proceeding without impediment, the special committee had concluded, shortly after its creation, that it was not necessary either to retain independent consultants, legal or financial, or even to meet. Time's board was unanimously in favor of the proposed merger with Warner; and, by the end of May, the Time–Warner merger appeared to be an accomplished fact.

On June 7, 1989, these wishful assumptions were shattered by Paramount's surprising announcement of its all-cash offer to purchase all outstanding shares of Time for $175 per share. The following day, June 8, the trading price of Time's stock rose from $126 to $170 per share. Paramount's offer was said to be "fully negotiable." [8]

Time found Paramount's "fully negotiable" offer to be in fact subject to at least three conditions. First, Time had to terminate its merger agreement and stock ex-change agreement with Warner, and remove certain other of its defensive devices, including the redemption of Time's shareholder rights. Second, Paramount had to obtain the required cable franchise transfers from Time in a fashion acceptable to Paramount in its sole discretion. Finally, the offer depended upon a judicial determination that section 203 of the General Corporate Law of Delaware (The Delaware Anti–Takeover Statute) was inapplicable to any Time–Paramount merger. While Paramount's board had been privately advised that it could take months, perhaps over a year, to forge and consummate the deal, Paramount's board publicly proclaimed its ability to close the offer by July 5, 1989. Paramount executives later conceded that none of its directors believed that July 5th was a realistic date to close the transaction.

On June 8, 1989, Time formally responded to Paramount's offer. Time's chairman and CEO, J. Richard Munro, sent an aggressively worded letter to Paramount's CEO, Martin Davis. Munro's letter attacked Davis' personal integrity and called Paramount's offer "smoke and mirrors." Time's nonmanagement directors were not shown the letter before it was sent. However, at a board meeting that same day, all members endorsed management's response as well as the letter's content.

Over the following eight days, Time's board met three times to discuss Paramount's $175 offer. The board viewed Paramount's offer as inadequate and concluded that its proposed merger with Warner was the better course of action. Therefore, the board declined to open any negotiations with Paramount and held steady its course toward a merger with Warner.

In June, Time's board of directors met several times. During the course of their June meetings, Time's outside directors met frequently without management, officers or directors being present. At the request of the outside directors, corporate counsel was present during the board meet-

8. Subsequently, it was established that Paramount's board had decided as early as March 1989 to move to acquire Time. However, Paramount management intentionally delayed publi-cizing its proposal until Time had mailed to its stockholders its Time–Warner merger proposal along with the required proxy statements.

ings and, from time to time, the management directors were asked to leave the board sessions. During the course of these meetings, Time's financial advisors informed the board that, on an auction basis, Time's per share value was materially higher than Warner's $175 per share offer.[9] After this advice, the board concluded that Paramount's $175 offer was inadequate.

At these June meetings, certain Time directors expressed their concern that Time stockholders would not comprehend the long-term benefits of the Warner merger. Large quantities of Time shares were held by institutional investors. The board feared that even though there appeared to be wide support for the Warner transaction, Paramount's cash premium would be a tempting prospect to these investors. In mid-June, Time sought permission from the New York Stock Exchange to alter its rules and allow the Time–Warner merger to proceed without stockholder approval. Time did so at Warner's insistence. The New York Stock Exchange rejected Time's request on June 15; and on that day, the value of Time stock reached $182 per share.

The following day, June 16, Time's board met to take up Paramount's offer. The board's prevailing belief was that Paramount's bid posed a threat to Time's control of its own destiny and retention of the "Time Culture." Even after Time's financial advisors made another presentation of Paramount and its business attributes, Time's board maintained its position that a combination with Warner offered greater potential for Time. Warner provided Time a much desired production capability and an established international marketing chain. Time's advisors suggested various options, including defensive measures. The board considered and rejected the idea of purchasing Paramount in a "Pac Man"

defense.[10] The board considered other defenses, including a recapitalization, the acquisition of another company, and a material change in the present capitalization structure or dividend policy. The board determined to retain its same advisors even in light of the changed circumstances. The board rescinded its agreement to pay its advisors a bonus based on the consummation of the Time–Warner merger and agreed to pay a flat fee for any advice rendered. Finally, Time's board formally rejected Paramount's offer.[11]

At the same meeting, Time's board decided to recast its consolidation with Warner into an outright cash and securities acquisition of Warner by Time; and Time so informed Warner. Time accordingly restructured its proposal to acquire Warner as follows: Time would make an immediate all-cash offer for 51% of Warner's outstanding stock at $70 per share. The remaining 49% would be purchased at some later date for a mixture of cash and securities worth $70 per share. To provide the funds required for its outright acquisition of Warner, Time would assume 7–10 billion dollars worth of debt, thus eliminating one of the principal transaction-related benefits of the original merger agreement. Nine billion dollars of the total purchase price would be allocated to the purchase of Warner's goodwill.

Warner agreed but insisted on certain terms. Warner sought a control premium and guarantees that the governance provisions found in the original merger agreement would remain intact. Warner further sought agreements that Time would not employ its poison pill against Warner and that, unless enjoined, Time would be legally bound to complete the transaction. Time's board agreed to these last measures only at the insistence of Warner. For its part, Time was assured of its ability to extend its

---

**9.** Time's advisors estimated the value of Time in a control premium situation to be significantly higher than the value of Time in other than a sale situation.

**10.** In a "Pac Man" defense, Time would launch a tender offer for the stock of Paramount, thus consuming its rival. *Moran v. Household Intern., Inc.,* Del.Supr., 500 A.2d 1346, 1350 n. 6 (1985).

**11.** Meanwhile, Time had already begun erecting impediments to Paramount's offer. Time encouraged local cable franchises to sue Paramount to prevent it from easily obtaining the franchises.

efforts into production areas and international markets, all the while maintaining the Time identity and culture. The Chancellor found the initial Time–Warner transaction to have been negotiated at arms length and the restructured Time–Warner transaction to have resulted from Paramount's offer and its expected effect on a Time shareholder vote.

On June 23, 1989, Paramount raised its all-cash offer to buy Time's outstanding stock to $200 per share. Paramount still professed that all aspects of the offer were negotiable. Time's board met on June 26, 1989 and formally rejected Paramount's $200 per share second offer. The board reiterated its belief that, despite the $25 increase, the offer was still inadequate. The Time board maintained that the Warner transaction offered a greater long-term value for the stockholders and, unlike Paramount's offer, did not pose a threat to Time's survival and its "culture." Paramount then filed this action in the Court of Chancery.

## II

■ The Shareholder Plaintiffs first assert a *Revlon* claim. They contend that the March 4 Time–Warner agreement effectively put Time up for sale, triggering *Revlon* duties, requiring Time's board to enhance short-term shareholder value and to treat all other interested acquirors on an equal basis. The Shareholder Plaintiffs base this argument on two facts: (i) the ultimate Time–Warner exchange ratio of .465 favoring Warner, resulting in Warner shareholders' receipt of 62% of the combined company; and (ii) the subjective intent of Time's directors as evidenced in their statements that the market might perceive the Time–Warner merger as putting Time up "for sale" and their adoption of various defensive measures.

The Shareholder Plaintiffs further contend that Time's directors, in structuring the original merger transaction to be "takeover-proof," triggered *Revlon* duties by foreclosing their shareholders from any prospect of obtaining a control premium. In short, plaintiffs argue that Time's board's decision to merge with Warner imposed a fiduciary duty to maximize immediate share value and not erect unreasonable barriers to further bids. Therefore, they argue, the Chancellor erred in finding: that Paramount's bid for Time did not place Time "for sale"; that Time's transaction with Warner did not result in any transfer of control; and that the combined Time–Warner was not so large as to preclude the possibility of the stockholders of Time–Warner receiving a future control premium.

Paramount asserts only a *Unocal* claim in which the shareholder plaintiffs join. Paramount contends that the Chancellor, in applying the first part of the *Unocal* test, erred in finding that Time's board had reasonable grounds to believe that Paramount posed both a legally cognizable threat to Time shareholders and a danger to Time's corporate policy and effectiveness. Paramount also contests the court's finding that Time's board made a reasonable and objective investigation of Paramount's offer so as to be informed before rejecting it. Paramount further claims that the court erred in applying *Unocal*'s second part in finding Time's response to be "reasonable." Paramount points primarily to the preclusive effect of the revised agreement which denied Time shareholders the opportunity both to vote on the agreement and to respond to Paramount's tender offer. Paramount argues that the underlying motivation of Time's board in adopting these defensive measures was management's desire to perpetuate itself in office.

The Court of Chancery posed the pivotal question presented by this case to be: Under what circumstances must a board of directors abandon an in-place plan of corporate development in order to provide its shareholders with the option to elect and realize an immediate control premium? As applied to this case, the question becomes: Did Time's board, having developed a strategic plan of global expansion to be launched through a business combination with Warner, come under a fiduciary duty to jettison its plan and put the corpora-

**1150**

tion's future in the hands of its shareholders?

■ While we affirm the result reached by the Chancellor, we think it unwise to place undue emphasis upon long-term versus short-term corporate strategy. Two key predicates underpin our analysis. First, Delaware law imposes on a board of directors the duty to manage the business and affairs of the corporation. 8 *Del. C.* § 141(a). This broad mandate includes a conferred authority to set a corporate course of action, including time frame, designed to enhance corporate profitability. Thus, the question of "long-term" versus "short-term" values is largely irrelevant because directors, generally, are obliged to chart a course for a corporation which is in its best interests without regard to a fixed investment horizon. Second, absent a limited set of circumstances as defined under *Revlon*, a board of directors, while always required to act in an informed manner, is not under any *per se* duty to maximize shareholder value in the short term, even in the context of a takeover.[12] In our view, the pivotal question presented by this case is: "Did Time, by entering into the proposed merger with Warner, put itself up for sale?" A resolution of that issue through application of *Revlon* has a significant bearing upon the resolution of the derivative *Unocal* issue.

### A.

We first take up plaintiffs' principal *Revlon* argument, summarized above. In rejecting this argument, the Chancellor found the original Time–Warner merger agreement not to constitute a "change of control" and concluded that the transaction did not trigger *Revlon* duties. The Chancellor's conclusion is premised on a finding

that "[b]efore the merger agreement was signed, control of the corporation existed in a fluid aggregation of unaffiliated shareholders representing a voting majority—in other words, in the market." The Chancellor's findings of fact are supported by the record and his conclusion is correct as a matter of law. However, we premise our rejection of plaintiffs' *Revlon* claim on different grounds, namely, the absence of any substantial evidence to conclude that Time's board, in negotiating with Warner, made the dissolution or break-up of the corporate entity inevitable, as was the case in *Revlon*.

■ Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate *Revlon* duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company. *See, e.g., Mills Acquisition Co. v. Macmillan, Inc,* Del.Supr., 559 A.2d 1261 (1988). However, *Revlon* duties may also be triggered where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the breakup of the company.[13] Thus, in *Revlon*, when the board responded to Pantry Pride's offer by contemplating a "bust-up" sale of assets in a leveraged acquisition, we imposed upon the board a duty to maximize immediate shareholder value and an obligation to auction the company fairly. If, however, the board's reaction to a hostile tender offer is found to constitute only a defensive response and not an abandonment of the corporation's continued existence, *Revlon* duties are not triggered, though *Unocal*

---

**12.** Thus, we endorse the Chancellor's conclusion that it is not a breach of faith for directors to determine that the present stock market price of shares is not representative of true value or that there may indeed be several market values for any corporation's stock. We have so held in another context. *See Van Gorkom,* 488 A.2d at 876.

**13.** As we stated in *Revlon,* in both such cases, "[t]he duty of the board [has] changed from the preservation of ... [the] corporate entity to the maximization of the company's value at a sale for the stockholder's benefit.... [The board] no longer face[s] threats to corporate policy and effectiveness, or to the stockholders' interests, from a grossly inadequate bid." *Revlon v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 182 (1986).

duties attach.[14] *See, e.g., Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1345 (1987).

The plaintiffs insist that even though the original Time–Warner agreement may not have worked "an objective change of control," the transaction made a "sale" of Time inevitable. Plaintiffs rely on the subjective intent of Time's board of directors and principally upon certain board members' expressions of concern that the Warner transaction *might* be viewed as effectively putting Time up for sale. Plaintiffs argue that the use of a lock-up agreement, a no-shop clause, and so-called "dry-up" agreements prevented shareholders from obtaining a control premium in the immediate future and thus violated *Revlon.*

■ We agree with the Chancellor that such evidence is entirely insufficient to invoke *Revlon* duties; and we decline to extend *Revlon*'s application to corporate transactions simply because they might be construed as putting a corporation either "in play" or "up for sale." *See Citron v. Fairchild Camera,* Del.Supr., 569 A.2d 53, (1989); *Macmillan,* 559 A.2d at 1285 n. 35. The adoption of structural safety devices alone does not trigger *Revlon.*[15] Rather, as the Chancellor stated, such devices are properly subject to a *Unocal* analysis.

Finally, we do not find in Time's recasting of its merger agreement with Warner from a share exchange to a share purchase a basis to conclude that Time had either abandoned its strategic plan or made a sale of Time inevitable.[16] The Chancellor found

that although the merged Time–Warner company would be large (with a value approaching approximately $30 billion), recent takeover cases have proven that acquisition of the combined company might nonetheless be possible. *In re Time Incorporated Shareholder Litigation,* Del.Ch., C.A. No. 10670, Allen, C. (July 14, 1989), slip op. at 56. The legal consequence is that *Unocal* alone applies to determine whether the business judgment rule attaches to the revised agreement. Plaintiffs' analogy to *Macmillan* thus collapses and plaintiffs' reliance on *Macmillan* is misplaced.

### B.

■ We turn now to plaintiffs' *Unocal* claim. We begin by noting, as did the Chancellor, that our decision does not require us to pass on the wisdom of the board's decision to enter into the original Time–Warner agreement. That is not a court's task. Our task is simply to review the record to determine whether there is sufficient evidence to support the Chancellor's conclusion that the initial Time–Warner agreement was the product of a proper exercise of business judgment. *Macmillan,* 559 A.2d at 1288.

We have purposely detailed the evidence of the Time board's deliberative approach, beginning in 1983–84, to expand itself. Time's decision in 1988 to combine with Warner was made only after what could be fairly characterized as an exhaustive ap-

14. Within the auction process, any action taken by the board must be reasonably related to the threat posed or reasonable in relation to the advantage sought, *see Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1288 (1988). Thus, a *Unocal* analysis may be appropriate when a corporation is in a *Revlon* situation and *Revlon* duties may be triggered by a defensive action taken in response to a hostile offer. Since *Revlon,* we have stated that differing treatment of various bidders is not actionable when such action reasonably relates to achieving the best price available for the stockholders. *Macmillan,* 559 A.2d at 1286–87.

15. Although the legality of the various safety devices adopted to protect the original agreement is not a central issue, there is substantial evidence to support each of the trial court's

related conclusions. Thus, the court found that the concept of the Share Exchange Agreement predated any takeover threat by Paramount and had been adopted for a rational business purpose: to deter Time and Warner from being "put in play" by their March 4 Agreement. The court further found that Time had adopted the "no-shop" clause at Warner's insistence and for Warner's protection. Finally, although certain aspects of the "dry-up" agreements were suspect on their face, we concur in the Chancellor's view that in this case they were inconsequential.

16. We note that, although Time's advisors presented the board with such alternatives as an auction or sale to a third party bidder, the board rejected those responses, preferring to go forward with its pre-existing plan rather than adopt an alternative to Paramount's proposal.

praisal of Time's future as a corporation. After concluding in 1983–84 that the corporation must expand to survive, and beyond journalism into entertainment, the board combed the field of available entertainment companies. By 1987 Time had focused upon Warner; by late July 1988 Time's board was convinced that Warner would provide the best "fit" for Time to achieve its strategic objectives. The record attests to the zealousness of Time's executives, fully supported by their directors, in seeing to the preservation of Time's "culture," i.e., its perceived editorial integrity in journalism. We find ample evidence in the record to support the Chancellor's conclusion that the Time board's decision to expand the business of the company through its March 3 merger with Warner was entitled to the protection of the business judgment rule. See Aronson v. Lewis, Del.Supr., 473 A.2d 805, 812 (1984).

The Chancellor reached a different conclusion in addressing the Time–Warner transaction as revised three months later. He found that the revised agreement was defense-motivated and designed to avoid the potentially disruptive effect that Paramount's offer would have had on consummation of the proposed merger were it put to a shareholder vote. Thus, the court declined to apply the traditional business judgment rule to the revised transaction and instead analyzed the Time board's June 16 decision under Unocal. The court ruled that Unocal applied to all director actions taken, following receipt of Paramount's hostile tender offer, that were reasonably determined to be defensive. Clearly that was a correct ruling and no party disputes that ruling.

■ In Unocal, we held that before the business judgment rule is applied to a board's adoption of a defensive measure, the burden will lie with the board to prove (a) reasonable grounds for believing that a danger to corporate policy and effectiveness existed; and (b) that the defensive measure adopted was reasonable in relation to the threat posed. Unocal, 493 A.2d 946. Directors satisfy the first part of the Unocal test by demonstrating good faith and reasonable investigation. We have repeatedly stated that the refusal to entertain an offer may comport with a valid exercise of a board's business judgment. See, e.g., Macmillan, 559 A.2d at 1285 n. 35; Van Gorkom, 488 A.2d at 881; Pogostin v. Rice, Del.Supr., 480 A.2d 619, 627 (1984).

Unocal involved a two-tier, highly coercive tender offer. In such a case, the threat is obvious: shareholders may be compelled to tender to avoid being treated adversely in the second stage of the transaction. Accord Ivanhoe, 535 at 1344. In subsequent cases, the Court of Chancery has suggested that an all-cash, all-shares offer, falling within a range of values that a shareholder might reasonably prefer, cannot constitute a legally recognized "threat" to shareholder interests sufficient to withstand a Unocal analysis. AC Acquisitions Corp. v. Anderson, Clayton & Co., Del.Ch., 519 A.2d 103 (1986); see Grand Metropolitan, PLC v. Pillsbury Co., Del.Ch., 558 A.2d 1049 (1988); City Capital Associates v. Interco, Inc., Del. Ch., 551 A.2d 787 (1988). In those cases, the Court of Chancery determined that whatever threat existed related only to the shareholders and only to price and not to the corporation.

■ From those decisions by our Court of Chancery, Paramount and the individual plaintiffs extrapolate a rule of law that an all-cash, all-shares offer with values reasonably in the range of acceptable price cannot pose any objective threat to a corporation or its shareholders. Thus, Paramount would have us hold that only if the value of Paramount's offer were determined to be clearly inferior to the value created by management's plan to merge with Warner could the offer be viewed—objectively—as a threat.

Implicit in the plaintiffs' argument is the view that a hostile tender offer can pose only two types of threats: the threat of coercion that results from a two-tier offer promising unequal treatment for nontendering shareholders; and the threat of inadequate value from an all-shares, all-cash offer at a price below what a target board

in good faith deems to be the present value of its shares. *See, e.g., Interco*, 551 A.2d at 797; *see also BNS, Inc. v. Koppers*, D.Del., 683 F.Supp. 458 (1988). Since Paramount's offer was all-cash, the only conceivable "threat," plaintiffs argue, was inadequate value.[17] We disapprove of such a narrow and rigid construction of *Unocal*, for the reasons which follow.

Plaintiffs' position represents a fundamental misconception of our standard of review under *Unocal* principally because it would involve the court in substituting its judgment as to what is a "better" deal for that of a corporation's board of directors. To the extent that the Court of Chancery has recently done so in certain of its opinions, we hereby reject such approach as not in keeping with a proper *Unocal* analysis. *See, e.g., Interco*, 551 A.2d 787, and its progeny; *but see TW Services, Inc. v. SWT Acquisition Corp.*, Del.Ch., C.A. No. 1047, Allen, C. 1989 WL 20290 (March 2, 1989).

The usefulness of *Unocal* as an analytical tool is precisely its flexibility in the face of a variety of fact scenarios. *Unocal* is not intended as an abstract standard; neither is it a structured and mechanistic procedure of appraisal. Thus, we have said that directors may consider, when evaluating the threat posed by a takeover bid, the "inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on 'constituencies' other than shareholders ... the risk of nonconsummation, and the quality of securities being offered in the exchange." 493 A.2d at 955. The open-ended analysis mandated by *Unocal* is not intended to lead to a simple mathematical exercise: that is, of comparing the discounted value of Time–Warner's expected trading price at some future date with Paramount's offer and determining which is the higher. Indeed, in our view, precepts underlying the business judgment rule militate against a court's engaging in the process of attempting to appraise and evaluate the relative merits of a long-term versus a short-term investment goal for shareholders. To engage in such an exercise is a distortion of the *Unocal* process and, in particular, the application of the second part of *Unocal*'s test, discussed below.

In this case, the Time board reasonably determined that inadequate value was not the only legally cognizable threat that Paramount's all-cash, all-shares offer could present. Time's board concluded that Paramount's eleventh hour offer posed other threats. One concern was that Time shareholders might elect to tender into Paramount's cash offer in ignorance or a mistaken belief of the strategic benefit which a business combination with Warner might produce. Moreover, Time viewed the conditions attached to Paramount's offer as introducing a degree of uncertainty that skewed a comparative analysis. Further, the timing of Paramount's offer to follow issuance of Time's proxy notice was viewed as arguably designed to upset, if not confuse, the Time stockholders' vote. Given this record evidence, we cannot conclude that the Time board's decision of June 6 that Paramount's offer posed a threat to corporate policy and effectiveness was lacking in good faith or dominated by motives of either entrenchment or self-interest.

Paramount also contends that the Time board had not duly investigated Paramount's offer. Therefore, Paramount argues, Time was unable to make an informed decision that the offer posed a threat to Time's corporate policy. Al-

---

17. Some commentators have suggested that the threats posed by hostile offers be categorized into not two but three types: "(i) *opportunity loss* ... [where] a hostile offer might deprive target shareholders of the opportunity to select a superior alternative offered by target management [or, we would add, offered by another bidder]; (ii) *structural coercion*, ... the risk that disparate treatment of non-tendering shareholders might distort shareholders' tender decisions; and ... (iii) *substantive coercion*, ... the risk that shareholders will mistakenly accept an underpriced offer because they disbelieve management's representations of intrinsic value." The recognition of substantive coercion, the authors suggest, would help guarantee that the *Unocal* standard becomes an effective intermediate standard of review. Gilson & Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is There Substance to Proportionality Review?*, 44 The Business Lawyer, 247, 267 (1989).

though the Chancellor did not address this issue directly, his findings of fact do detail Time's exploration of the available entertainment companies, including Paramount, before determining that Warner provided the best strategic "fit." In addition, the court found that Time's board rejected Paramount's offer because Paramount did not serve Time's objectives or meet Time's needs. Thus, the record does, in our judgment, demonstrate that Time's board was adequately informed of the potential benefits of a transaction with Paramount. We agree with the Chancellor that the Time board's lengthy pre-June investigation of potential merger candidates, including Paramount, mooted any obligation on Time's part to halt its merger process with Warner to reconsider Paramount. Time's board was under no obligation to negotiate with Paramount. *Unocal*, 493 A.2d at 954–55; *see also Macmillan*, 559 A.2d at 1285 n. 35. Time's failure to negotiate cannot be fairly found to have been uninformed. The evidence supporting this finding is materially enhanced by the fact that twelve of Time's sixteen board members were outside independent directors. *Unocal*, 493 A.2d at 955; *Moran v. Household Intern., Inc.*, Del.Supr., 500 A.2d 1346, 1356 (1985).

We turn to the second part of the *Unocal* analysis. The obvious requisite to determining the reasonableness of a defensive action is a clear identification of the nature of the threat. As the Chancellor correctly noted, this "requires an evaluation of the importance of the corporate objective threatened; alternative methods of protecting that objective; impacts of the 'defensive' action, and other relevant factors." *In Re: Time Incorporated Shareholder Litigation*, Del.Ch., 1989 WL 79880 (July 14, 1989). It is not until both parts of the *Unocal* inquiry have been satisfied that the business judgment rule attaches to defensive actions of a board of directors. *Unocal*, 493 A.2d at 954.[18] As applied to the facts of this case, the question is whether

the record evidence supports the Court of Chancery's conclusion that the restructuring of the Time–Warner transaction, including the adoption of several preclusive defensive measures, was a *reasonable response* in relation to a perceived threat.

■■■■ Paramount argues that, assuming its tender offer posed a threat, Time's response was unreasonable in precluding Time's shareholders from accepting the tender offer or receiving a control premium in the immediately foreseeable future. Once again, the contention stems, we believe, from a fundamental misunderstanding of where the power of corporate governance lies. Delaware law confers the management of the corporate enterprise to the stockholders' duly elected board representatives. 8 *Del.C.* § 141(a). The fiduciary duty to manage a corporate enterprise includes the selection of a time frame for achievement of corporate goals. That duty may not be delegated to the stockholders. *Van Gorkom*, 488 A.2d at 873. Directors are not obliged to abandon a deliberately conceived corporate plan for a short-term shareholder profit unless there is clearly no basis to sustain the corporate strategy. *See, e.g., Revlon*, 506 A.2d 173.

Although the Chancellor blurred somewhat the discrete analyses required under *Unocal*, he did conclude that Time's board reasonably perceived Paramount's offer to be a significant threat to the planned Time–Warner merger and that Time's response was not "overly broad." We have found that even in light of a valid threat, management actions that are coercive in nature or force upon shareholders a management-sponsored alternative to a hostile offer may be struck down as unreasonable and nonproportionate responses. *Macmillan*, 559 A.2d 1261; *AC Acquisitions Corp.*, 519 A.2d 103.

Here, on the record facts, the Chancellor found that Time's responsive action to Paramount's tender offer was not aimed at

---

**18.** Some commentators have criticized *Unocal* by arguing that once the board's deliberative process has been analyzed and found not to be wanting in objectivity, good faith or deliberateness, the so-called "enhanced" business judgment rule has been satisfied and no further inquiry is undertaken. *See generally* Johnson & Siegel, *Corporate Mergers: Redefining the Role of Target Directors*, 136 U.Pa.L.Rev. 315 (1987). We reject such views.

"cramming down" on its shareholders a management-sponsored alternative, but rather had as its goal the carrying forward of a pre-existing transaction in an altered form.[19] Thus, the response was reasonably related to the threat. The Chancellor noted that the revised agreement and its accompanying safety devices did not preclude Paramount from making an offer for the combined Time–Warner company or from changing the conditions of its offer so as not to make the offer dependent upon the nullification of the Time–Warner agreement. Thus, the response was proportionate. We affirm the Chancellor's rulings as clearly supported by the record. Finally, we note that although Time was required, as a result of Paramount's hostile offer, to incur a heavy debt to finance its acquisition of Warner, that fact alone does not render the board's decision unreasonable so long as the directors could reasonably perceive the debt load not to be so injurious to the corporation as to jeopardize its well being.

## C.

### Conclusion

Applying the test for grant or denial of preliminary injunctive relief, we find plaintiffs failed to establish a reasonable likelihood of ultimate success on the merits. Therefore, we affirm.

---

**19.** The Chancellor cited *Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 257 (1989), as a closely analogous case. In that case, the Court of Chancery upheld, in the face of a takeover bid, the establishment of an employee stock ownership plan that had a significant anti-takeover effect. The Court of Chancery upheld the board's action largely because the ESOP had been adopted *prior* to any contest for control and was reasonably determined to increase productivity and enhance profits. The ESOP did not appear to be primarily a device to affect or secure corporate control.