# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KENNETH T. SIMEONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-1120-LWW |
| | ) | |
| | ) | |
| THE WALT DISNEY COMPANY, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 15, 2023
Date Decided: June 27, 2023

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; Paul M. Jonna, LIMANDRI & JONNA LLP, Rancho Santa Fe, California; *Attorneys for Plaintiff Kenneth T. Simeone*

Blake Rohrbacher & Morgan R. Harrison, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Kevin J. Orsini, Rory A. Leraris & Andrew D. Huynh, CRAVATH, SWAINE & MOORE LLP, New York, New York; *Attorneys for Defendant The Walt Disney Company*

**WILL, Vice Chancellor**

This books and records action originates from The Walt Disney Company's response to Florida House Bill 1557. Disney initially took no public position on the bill, which limits instruction on sexual orientation or gender identity in Florida classrooms. After facing criticism from its employees, Disney reversed course and spoke out against the legislation. Florida's Governor took issue with Disney's stance and Florida's legislature voted to dissolve a special tax district encompassing the Walt Disney World Resort.

Afterwards, the plaintiff—a longtime Disney stockholder—was solicited by counsel to serve a books and records demand. The demand asserts that Disney's directors and officers may have breached their fiduciary duties to the company and its stockholders by opposing HB 1557. The plaintiff's theory of wrongdoing is that Disney's fiduciaries either put their own beliefs ahead of their obligations to stockholders or flouted the risk of losing rights associated with the special district.

Disney told the plaintiff that he lacked grounds to obtain books and records because its directors and officers had not engaged in mismanagement. Nevertheless, Disney produced certain board minutes and corporate policies to the plaintiff. The plaintiff was unsatisfied and filed litigation.

Weighty public policy questions surround the margins of this lawsuit. But when they are stripped away, the case becomes quite simple. The court must

1

determine whether the plaintiff has demonstrated a proper purpose to inspect books and records. He decidedly has not.

Delaware law vests directors with significant discretion to guide corporate strategy—including on social and political issues. Given the diversity of viewpoints held by directors, management, stockholders, and other stakeholders, corporate speech on external policy matters brings both risks and opportunities. The board is empowered to weigh these competing considerations and decide whether it is in the corporation's best interest to act (or not act).

This suit concerns such a business decision by the Disney board—a decision that cannot provide a credible basis to suspect potential mismanagement irrespective of its outcome. There is no indication that the directors suffered from disabling conflicts. Nor is there any evidence that the directors were grossly negligent or acted in bad faith. Rather, the board held a special meeting to discuss Disney's approach to the legislation and the employees' negative response. Disney's public rebuke of HB 1557 followed.

The plaintiff and his counsel may disagree with Disney's position on HB 1557. But their disagreement is not evidence of wrongdoing. Regardless, the plaintiff has all necessary and essential documents relevant to his purpose. Judgment must be entered for Disney.

## I.   BACKGROUND

This case was tried on a paper record consisting of 48 exhibits, including a transcript of the plaintiff's deposition.[1]  The facts described below have been proven by a preponderance of the evidence, are drawn from admitted allegations in the pleadings or stipulated facts in the pre-trial order, or are not subject to reasonable dispute.[2]

### A.   HB 1557 and Disney's Initial Silence

On February 24, 2022, the Florida House of Representatives voted to approve House Bill 1557, titled the "Parental Rights in Education" bill.[3]  HB 1557 prohibits teachers from discussing certain topics related to sexual orientation and gender identity in kindergarten through third grade classrooms.[4]  For students in higher

---

[1] Exhibits jointly submitted by the parties at trial are cited according to the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined.  Pin cites are to the last three digits of document Bates stamps absent internal pagination.

[2] *See In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) ("The court may take judicial notice of facts publicly available in filings with the SEC.").

[3] Fla. HB 1557 (2022) (codified at Fla. Stat. Ann. § 1001.42(8)(c)(3)); *see also* Pre-trial Stipulation and Order (Dkt. 31) ("PTO") ¶ 7; JX 14.

[4] Fla. Stat. Ann. § 1001.42(8)(c)(3); *see also* JX 14.

grades, the legislation prohibits lessons on these topics that are not "age-appropriate or developmentally appropriate . . . in accordance with state standards."[5]

Defendant The Walt Disney Company quickly came under scrutiny for its financial backing of HB 1557's sponsors.[6] Disney, a leading media and entertainment company incorporated in Delaware and headquartered in California, has a substantial presence in Florida where its Walt Disney World Resort is located.[7] Disney is among the largest employers in Florida.[8]

On March 7, 2022, Robert Chapek—then Disney's Chief Executive Officer—circulated an internal memo to Disney employees expressing the company's "unwavering commitment to the LGBTQ+ community."[9] Chapek noted that although the company had not made a public statement opposing HB 1557, Disney's "lack of statement" should not be mistaken "for a lack of support."[10] He wrote: "We all share the same goal of a more tolerant, respectful world. Where we may differ is

---

[5] Fla. Stat. Ann. § 1001.42(8)(c)(3); *see also* JX 12.

[6] *E.g.*, JX 4.

[7] PTO ¶¶ 4-5; *see* The Walt Disney Company, https://thewaltdisneycompany.com/ (last visited June 22, 2023); Walt Disney World, https://disneyworld.disney.go.com/ (last visited June 22, 2023).

[8] *See* JX 10.

[9] JX 4; *see* JX 14.

[10] JX 4.

in the tactics to get there."[11]  Chapek explained that Disney would "continue to be a leader in supporting organizations that champion diversity."[12]

Chapek's memo was met with pervasive disappointment and frustration from Disney employees and creative partners.[13]  Some—including actors, directors, writers, and animators—called the memo "weak" and "unacceptable."[14]  Others demanded that Disney take a public stand against HB 1557.[15]

## B.    Disney's Public Opposition to HB 1557

On March 8, 2022, the Florida Senate passed HB 1557 by a vote of 22 to 17.[16] The bill was then sent to Governor Ron DeSantis for his signature.[17]

Also on March 8, Disney's Board of Directors held a special meeting about Disney's "Political Engagement and Communications."[18]  Chapek and Disney's then-Chief Corporate Affairs Officer Geoff Morrell "led a discussion with the Board members relating to the communications plan, philosophy and approach regarding

---

[11] *Id.*

[12] *Id.*

[13] *See, e.g.*, *id.*

[14] *E.g.*, *id.* (quoting social media posts).

[15] *E.g.*, *id.* (quoting social media posts).

[16] HB 1557, The Florida Senate, https://www.flsenate.gov/Session/Bill/2022/1557/?Tab= VoteHistory (last visited June 22, 2023).

[17] JX 14.

[18] JX 24 at '051-053.

Florida legislation and employee response."[19]  Chapek and Morrell "responded to Board members' questions and comments."[20]

Disney's annual stockholder meeting was held the next day, March 9, beginning at 10:00 a.m. Pacific.[21]  There, Chapek acknowledged that "many are upset that we did not speak out against the bill" and that the company's original approach to HB 1557 "didn't quite get the job done."[22]  He explained: "We were opposed to the bill from the outset, but we chose not to take a public position on it because we thought we could be more effective working behind the scenes, engaging directly with lawmakers on both sides of the aisle."[23]  Chapek announced that Disney was joining a petition against similar legislation and would be supporting efforts to protect the LGBTQ+ community.[24]  He noted that he had spoken to Governor DeSantis that morning to express "our disappointment and concern" with HB 1557.[25]

---

[19] *Id.* at '052.

[20] *Id.*

[21] *See* JX 5; *see also* The Walt Disney Company, Definitive Proxy Statement (Schedule 14A) (Jan. 19, 2022).

[22] JX 5; JX 6; *see also 2022 Annual Meeting of Shareholders*, The Walt Disney Company (Mar. 9, 2022), https://thewaltdisneycompany.com/app/uploads/2022/03/2022-ASM-transcript.pdf.

[23] JX 5.

[24] *Id.*; JX 6.

[25] JX 6 ("I [Chapek] look forward to visiting with the governor with a small delegation of cast members who are involved in this movement.").

In his 2023 memoir, Governor DeSantis recalls telling Chapek: "You will end up putting yourself in an untenable position. People like me will say, 'Gee, how come Disney has never said anything about China, where they make a fortune?'"[26] The Governor wrote that after speaking to Chapek, he thought "this clash with Disney was over."[27]

On March 9 at 11:50 a.m. Pacific, the Board held a regularly scheduled meeting.[28] Chapek "provided an update on Company matters, addressing: Company values, approach to Florida legislation and [a] planned holistic review of political engagement to be discussed at the June Board retreat."[29] Chapek "responded to Board members' comments and questions" throughout his presentation.[30]

---

[26] JX 48 at 191. It is not obvious from the record when this conversation occurred, though the book describes it as happening when "the controversy over the Parental Rights in Education bill was coming to a head" and Disney was "getting a lot of pressure to weigh in against the bill." *Id.* at 190-91. Given the context, it seems more likely than not that this was the conversation Chapek referenced during the March 9 annual stockholder meeting. *See supra* note 25 and accompanying text.

[27] *Id.* at 194.

[28] JX 24 at '054-055.

[29] *Id.* at '055.

[30] *Id.*

7

On March 10, DeSantis publicly criticized companies "like [] Disney."[31]  He stated that Florida policy should be "based on the best interest of Florida citizens, not on the musing of woke corporations."[32]

Chapek sent another memo to Disney employees on March 11, thanking those who reached out to share their "pain, frustration and sadness over the company's response" to HB 1557.[33]  Chapek promised to "become a better ally."[34]

Governor DeSantis signed HB 1557 into law on March 28.[35]  The same day, Disney issued a public statement opposing the bill:

> Florida's HB 1557, also known as the "Don't Say Gay" bill, should never have passed and should never have been signed into law.  Our goal as a company is for this law to be repealed by the legislature or struck down in the courts, and we remain committed to supporting the national and state organizations working to achieve that.  We are dedicated to standing up for the rights and safety of LGBTQ+ members of the Disney family, as well as the LGBTQ+ community in Florida and across the country.[36]

In response, Governor DeSantis said that Disney had "crossed the line."[37]

---

[31] JX 7.

[32] *Id.*

[33] JX 8.

[34] *Id.*

[35] PTO ¶ 9.

[36] *Id.* ¶ 10; JX 9.

[37] JX 10.

## C.    Effects on the RCID

Disney's opposition to HB 1557 prompted Florida politicians to consider revoking Disney's ability to self-govern its lands within the Reedy Creek Improvement District (RCID).[38]

Florida's Reedy Creek Improvement Act (RCIA) was enacted in 1967.[39]  The RCIA formed the RCID, a special district consisting of 25,000 acres of land on which the Walt Disney World Resort was built.[40]  The RCID was granted the same authority and responsibility as a county government.[41]  For example, it is authorized to levy taxes, write building codes, and develop and maintain its own infrastructure.[42]  The RCID is run by a five-member board of supervisors, who were originally selected by landowners within the district.[43]

---

[38] *See* JX 11.

[39] *Id.*; *see also History*, Reedy Creek Improvement District, https://www.rcid.org/about /history (last visited June 22, 2023).

[40] JX 11.

[41] *See id.*; *see also About*, Reedy Creek Improvement District, https://www.rcid.org/about (last visited June 22, 2023).

[42] JX 13; *see also* Ch. 67-764, 1967 Fla. Laws 256.

[43] JX 13; *see also Board of Supervisors*, Reedy Creek Improvement District, https://www.rcid.org/about/board-of-supervisors-2 (last visited June 22, 2023).

On March 30, a Florida state representative tweeted that he had met with colleagues to discuss repealing the RCIA.[44] During a speech the following day, Governor DeSantis said that he supported a repeal of the law.[45]

On April 19, Governor DeSantis announced that he was expanding a special legislative session to evaluate abolishing the RCID and five other special districts unrelated to Disney.[46] Within 48 hours, the Florida House of Representatives voted 70 to 38 in favor of dissolving the special districts at issue.[47] Governor DeSantis wrote in his memoir that "[n]obody saw it coming, and Disney did not have enough time to put its army of high-powered lobbyists to work to try to derail the bill."[48] The dissolution was scheduled to go into effect in June 2023.[49]

On April 22, Governor DeSantis signed the dissolution bill into law.[50] He announced that Disney would no longer control the RCID and would be held responsible for certain Florida taxes.[51] He also announced that he would release a

---

[44] JX 11.

[45] *Id.*

[46] JX 14.

[47] *Id.*; JX 15; Fla. SB 4-C (2022).

[48] JX 48 at 199.

[49] Fla. SB 4-C (2022).

[50] *Id.*

[51] JX 17.

proposal making Disney responsible for over $1 billion in debts owed by the RCID.[52] Later, during a June 5, 2022 interview, Governor DeSantis recalled warning Disney that it "shouldn't get involved" with HB 1557 because "it's not going to work out well" for the company.[53]

Disney's stock price fell during the summer from $145.70 per share on March 1 to $91.84 on July 14.[54] On November 9—the day after Governor DeSantis was reelected—Disney's stock fell to $86.75 per share.[55]

## D. The Section 220 Demand and the First Document Production

On July 8, 2022, plaintiff Kenneth T. Simeone sent Disney a demand pursuant to 8 *Del. C.* § 220 to inspect corporate books and records.[56] The plaintiff has been a Disney stockholder since 1973 and lives in Kissimmee, Florida.[57]

According to the demand, Simeone is "concerned that officers and directors of Disney may have breached their fiduciary duties to the Company and its stockholders by, *inter alia*, failing to appreciate the known risk that the Company's

---

[52] *Id.*

[53] JX 18.

[54] *See The Walt Disney Company Common Stock Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/dis/historical (last visited June 22, 2023).

[55] *See id.*; JX 26.

[56] JX 19; PTO ¶ 11.

[57] JX 19 Ex. 2 at 1; JX 36 ("Pl.'s Dep.") at 6-8; PTO ¶ 3.

political stance would have on its financial position and the value of Disney stock."[58]

He suspects that Disney officers and directors "plac[ed] their own political views ahead of their duties to act in the best interests of Disney and its stockholders."[59] The demand listed four related, purported purposes for the inspection:

1. To investigate potential wrongdoing, mismanagement and breaches of fiduciary duties by members of Disney's Board, Company executives, or others in connection with the Company's decision to publicly oppose the Parental Rights Act, despite being warned, and therefore having knowledge, that such opposition would be harmful to the Company and stockholder value;

2. To determine the extent to which the Company's opposition, or perceived opposition, to the Parental Rights Act has harmed the Company's value, including but not limited to, the loss or potential loss of favorable tax benefits or other benefits the Company has traditionally received from the State of Florida, whether in connection with the Reddy [sic] Creek Improvement District, or otherwise;

3. To assess the ability of Disney's Board to impartially consider a demand for action, including a request for permission to file a derivative lawsuit on Disney's behalf; and

4. To explore possible remedial measures, including, without limitation, seeking a meeting with the Board to discuss proposed reforms, communicating with other Disney stockholders, preparing a stockholder resolution for Disney's next annual meeting, and/or taking appropriate legal action in the event that members of the Board and/or Disney executives did not properly discharge their fiduciary duties.[60]

---

[58] JX 19 at 3.

[59] *Id.*

[60] *Id.* at 4.

12

Simeone sought four categories of documents pertaining to the subject matter of the demand. These include: (1) director independence questionnaires and "any other documents" reflecting ties among Disney directors; (2) Disney policies or guidelines about charitable or political contributions, or public positions on legislation or public policy issues; (3) meeting minutes and materials from the Disney Board or any Board committee about the Parental Rights Act, Disney's March 28 press release, the dissolution of the RCID, the economic benefits to Disney from the RCID, and the policies and guidelines that were the subject of request; and (4) written correspondence "between or among any Disney directors (including [Chapek] in his capacity as CEO)" about the relevant issues.[61] He requested these documents for a three-year time period.

On July 15, Disney's outside counsel sent Simeone a written response to the demand.[62] This response explained that Simeone had failed to state a proper purpose for inspection and that the requested documents were not necessary and essential to any such purpose.[63] The letter closed by offering to further discuss the demand.[64]

---

[61] *Id.* at 5.

[62] JX 20; PTO ¶ 12.

[63] JX 20 at 2-3. The response also said that Simeone had failed to demonstrate he held Disney stock during the time of the alleged wrongdoing. *Id.* at 3-4. Simeone subsequently provided proof of continuous ownership. JX 21 at 3-5.

[64] JX 20 at 4.

Between July 15 and October 28, the parties met and conferred on the scope of a production of Disney books and records.[65] During these negotiations, the parties agreed that Disney could redact both privileged and non-responsive content from any Board materials that Disney produced in response to the demand.[66]

On October 28, after the parties executed a confidentiality agreement, Disney produced 73 pages of documents while "reserv[ing] all rights to challenge whether the Demand satisfie[d] the threshold requirements for an inspection under 8 *Del. C.* § 220."[67] The documents were redacted for responsiveness and attorney-client privilege in accordance with the parties' agreement.[68] The production included all Disney policies concerning charitable or political contributions that were in effect during the time period relevant to HB 1557, which were responsive to the second category of requested documents.[69] Disney also produced all formal Board documents—specifically, minutes—concerning HB 1557 in response to the third category of requests.[70] Disney declined to produce director independence questionnaires (category one) and email communications (category four).

---

[65] PTO ¶ 13.

[66] *Id.*

[67] JX 23 (transmittal letter); *see* JX 24 (production Bates labeled DIS000001-73).

[68] PTO ¶ 14.

[69] JX 24 at '072-073.

[70] *Id.* at '001-071.

14

## E. The Litigation and the Second Document Production

On December 5, 2022, Simeone filed a Verified Complaint Pursuant to 8 *Del. C.* § 220 to Compel Inspection of Books and Records (the "Complaint").[71] Disney answered the Complaint on December 27.[72]

Simeone served a set of document requests, interrogatories, and requests for admission on Disney.[73] He also served Disney with a notice of a Rule 30(b)(6) deposition for a corporate representative to testify about the contents of the documents at issue and the location and preservation of Board materials.[74] Disney refused to produce a Rule 30(b)(6) witness without a court order.[75] It subsequently produced Board policies about the taking and preserving of meeting minutes, along with a privilege log for the previously-produced materials.[76]

Disney correspondingly served discovery on the plaintiff.[77] On February 10, 2023, Disney deposed Simeone. During the deposition, Simeone's counsel instructed him not to answer questions about the terms of his attorney engagement

---

[71] Dkt. 1 ("Compl.").

[72] Dkt. 5.

[73] Dkt. 7.

[74] Dkt. 13.

[75] PTO ¶ 20.

[76] JX 34 (production Bates stamped DIS0000074-116); JX 44 (privilege log). The production included Disney's bylaws, as well as charters for the Board's Audit, Compensation, and Governance and Nominating Committees.

[77] Dkt. 8; *see* JX 33.

15

agreement related to the demand and this action.[78]  After the deposition, Disney renewed its request for the terms of Simeone's counsel's engagement.[79]  On February 28, Simeone served a verified interrogatory response about his fee and cost arrangements with counsel.[80]

A trial on a paper record was held on March 15.[81]  The matter was taken under advisement at that time.

## F.  Additional Events

On November 20, 2022, the Board announced that Chapek would be terminated as CEO.[82]  He was replaced by former Disney CEO Bob Iger.[83]

The Florida legislature eventually decided not to dissolve the RCID.[84]  On January 8, 2023, it was reported that Governor DeSantis had proposed installing a state-appointed board of supervisors to govern the district.[85]  Governor DeSantis explained that the proposal would eliminate Disney's "self-governing status" and

---

[78] PTO ¶ 22; Pl.'s Dep. 38-39.

[79] PTO ¶ 23.

[80] *Id.* ¶ 24; JX 45.

[81] Dkt. 35; Tr. of Mar. 15, 2023 Section 220 Trial (Dkt. 36) ("Trial Tr.").

[82] JX 28.

[83] JX 29.

[84] JX 41.

[85] JX 30 ("The corporate kingdom has come to an end.").

"special legal privileges."[86]   In February, Governor DeSantis signed a bill that effectively took control of the RCID (renamed the Central Florida Tourism Oversight District) and appointed five members to a reconstituted board of supervisors.[87]

According to media reports, the newly appointed board of supervisors discovered that before DeSantis signed this bill, the prior board had passed restrictive covenants and a development agreement giving Disney certain rights.[88] On May 5, Governor DeSantis signed another bill that would purportedly allow the new board of supervisors to void these agreements.[89]  Litigation (both by and against Disney) regarding the district is ongoing.[90]

---

[86] JX 35; *see also* JX 31.

[87] Fla. HB 9-B (2023); *see About Central Florida Tourism Oversight District*, Reedy Creek Improvement District, https://www.rcid.org/ (last visited June 22, 2023); *Governor Ron DeSantis Appoints Five to the Central Florida Tourism Oversight District*, Ron DeSantis 46th Governor of Florida (Feb. 27, 2023), https://www.flgov.com/2023/02/27/governor-ron-desantis-appoints-five-to-the-central-florida-tourism-oversight-district/.   I note that this development was not addressed at trial.  It, along with the events described in the remainder of this section, are included for the sake of context and completeness.  These events have no bearing on the outcome of this action.

[88] *See* Joseph Ax & Dawn Chmielewski, *DeSantis signs bill allowing Florida board to cancel Disney deals*, Reuters (May 5, 2023), https://www.reuters.com/world/us/desantis-signs-bill-allowing-florida-board-cancel-disney-deals-2023-05-05/;  Jesus Jiménez & Brooks Barnes, *What We Know About the DeSantis-Disney Dispute*, N.Y. Times (May 19, 2023), https://www.nytimes.com/article/disney-florida-desantis.html.

[89] Fla. SB 1604 (2023); Ax & Chmielewski, *supra* note 88; Jimenez & Barnes, *supra* note 88.

[90] *See* Compl., *Walt Disney Parks and Resorts U.S., Inc. v. DeSantis*, No. 4:23-cv-00163, 2023 WL 3098088 (N.D. Fla. Apr. 26, 2023); Compl., *Cent. Fla. Tourism Oversight*

17

## II. ANALYSIS

Section 220 of the Delaware General Corporation Law provides stockholders with a qualified right to inspect corporate books and records.[91] To obtain inspection, a stockholder must satisfy the statute's form and manner requirements.[92] The stockholder must also prove, "by a preponderance of the evidence, a proper purpose entitling the stockholder to an inspection of every item sought."[93] The stockholder must further "demonstrate by a preponderance of the evidence that 'each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection.'"[94]

The plaintiff does not meet the standard for a Section 220 inspection for three independent reasons. First, the purposes described in the demand are not the plaintiff's own purposes. Second, the plaintiff has not provided a credible basis from which to infer possible wrongdoing. Third, the defendant has provided the plaintiff with all necessary and essential documents.

---

*District v. Walt Disney Parks and Resorts U.S., Inc.*, No. 2023-CA-011818-O, 2023 WL 3178900 (Fla. Cir. Ct. May 1, 2023).

[91] *See Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006); *see* 8 *Del. C.* § 220.

[92] 8 *Del. C.* § 220(b). Disney does not dispute that the demand complied with Section 220's form and manner requirements. PTO ¶ 25.

[93] *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1028 (Del. 1996).

[94] *Lebanon Cnty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *6 (Del. Ch. Jan. 13, 2020) (quoting *Thomas & Betts*, 681 A.2d at 1035), *aff'd*, 243 A.3d 417 (Del. 2020).

## A. Whether the Stated Purposes Are the Plaintiff's Purposes

The "propriety of the stockholder's purpose" is the "paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records."[95] Section 220 defines a proper purpose as one "reasonably related to such person's interest as a stockholder."[96] In rare circumstances, a defendant can prove that a stockholder lacks a proper purpose where "the purposes for the inspection belong to [the stockholder's counsel]" rather than the stockholder himself.[97] Disney has prevailed in making that showing here.

Simeone testified that he did not consider pursuing litigation or making an inspection demand after learning about HB 1557.[98] His reaction to Disney's opposition to HB 1557 and the subsequent legislation rescinding the RCID was concern that his property tax bill would increase.[99] Simeone was later "contacted by

---

[95] *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).

[96] 8 *Del. C.* § 220(b).

[97] *Wilkinson v. A. Schulman, Inc.*, 2017 WL 5289553, at *2 (Del. Ch. Nov. 13, 2017) (explaining that although "[a] stockholder obviously can use counsel to seek books and records," the purposes for inspection must be the stockholder's own "actual purposes" rather than "counsel's purposes"); *see also Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007) ("A corporate defendant may resist demand where it shows that the stockholder's stated proper purpose is not the actual purpose for the demand."); *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *8 (Del. Ch. May 16, 2006) ("A defendant facing a Section 220 action may resist that demand by showing that the plaintiff's purpose, although a valid one, is not the actual purpose. In other words, the defendant may try to show that the plaintiff has pursued its claim under false pretenses.").

[98] Pl.'s Dep. 38.

[99] *Id.* at 24-26.

19

a lawyer" in his family—Brian McCall—who knew he was a Disney stockholder and solicited him to serve a demand.[100] After speaking to McCall, Simeone was contacted by Paul Jonna.[101] Jonna is Special Counsel to the Thomas More Society, a "public interest law firm championing Life, Family, and Freedom."[102] The plaintiff's verified interrogatory response states that the Thomas More Society is advancing costs for this litigation.[103]

The purposes stated in the demand are pretextual.[104] Simeone testified that his only purpose for inspection was to "know the person or persons who were responsible for making th[e] political decision" at Disney to publicly oppose HB 1557.[105] He said that he "hope[s] it becomes public and the other shareholders find out about" these identities.[106] He confirmed that he has no other purpose.[107]

---

[100] *Id.* at 26, 31-38; *see* JX 39; JX 40.

[101] Pl.'s Dep. 35-36. Simeone assumes that McCall gave Jonna his contact information. *Id.*

[102] Thomas More Society, https://thomasmoresociety.org (last visited June 25, 2023); *see* JX 38.

[103] JX 45 at 2.

[104] *Wilkinson*, 2017 WL 5289553, at *3 (concluding that a stockholder's stated purposes were pretextual where his counsel sought "to investigate different issues than what motivated the stockholder to respond to the law firm's solicitation").

[105] Pl.'s Dep. 40-42.

[106] *Id.*

[107] *Id.* ("Q: So is that the piece of information that you are seeking through this case, who made the decision? A: Yes, the persons that made the decisions. Q: Is there any other information that you believe you need as part of this litigation? A: No."). Even if identifying decision makers were a proper purpose, this information was already produced

The only evidence indicating that the purposes listed in the demand might belong to Simeone is the testimony his counsel elicited through leading redirect questions.[108]

The plaintiff's limited and non-substantive involvement in the demand and litigation further reveals the lawyer-driven nature of this action.[109] Simeone testified that he could not recall reading a draft of the demand before it was sent to Disney.[110] He reviewed but made no edits to the Complaint.[111] He did not see the news articles proffered as evidence in support of his claim.[112]

The plaintiff's counsel and the Thomas More Society are entitled to their beliefs. They are also entitled to pursue litigation in support of those beliefs. But a Section 220 suit, which is designed to address the plaintiff's interests as a stockholder, is not a vehicle to advance them.[113]

---

to the plaintiff. JX 24 at '051-52 (stating that Chapek and Morrell "led a discussion with the Board members" and listing the directors and officers in attendance at the meeting). The identities of those involved in Disney's opposition of HB 1557 were publicized when the plaintiff filed an unredacted version of the Complaint. Dkt. 3 ¶ 36.

[108] *See* Pl.'s Dep. 67-69. I give the testimony provided in response to these leading questions no weight.

[109] *See Wilkinson*, 2017 WL 5289553, at *3.

[110] Pl.'s Dep. 43.

[111] *Id.* at 43-44.

[112] *Id.* at 48-49.

[113] *See Berkowitz v. Legal Sea Foods, Inc.*, 1997 WL 153815, at *2 (Del. Ch. Mar. 24, 1997) (discussing the impropriety of a personal purpose for Section 220 inspection); *Lynn v. EnviroSource, Inc.*, 1991 WL 80242, at *2 (Del. Ch. May 13, 1991) (denying an inspection request because the plaintiff's stated purpose was not of general interest to stockholders).

## B.    Whether the Plaintiff Has Demonstrated a Proper Purpose

The plaintiff's demand identifies four purposes; all center around the same desire to investigate wrongdoing. The second and fourth purposes—to determine whether Disney's opposition to HB 1557 was harmful to the company and to "explore possible remedial measures"[114]—are derivative of and dependent upon whether there was mismanagement in the first place. The third purpose of assessing the impartiality of the Board if presented with a litigation demand—though proper in the abstract[115]—similarly focuses on whether the Board is interested in the alleged underlying wrongdoing.[116] Consequently, I focus on the first stated purpose: "[t]o investigate potential wrongdoing, mismanagement and breaches of fiduciary duties . . . in connection with the Company's decision to publicly oppose the Parental Rights Act."[117]

---

[114] JX 19 at 4.

[115] *See In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *16 (Del. Ch. May 30, 2019), *as revised* (May 31, 2019).

[116] No additional conflicts are described in the demand. *See Okla. Firefighters Pension & Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at *10 (Del. Ch. June 1, 2022) (stating that a stockholder plaintiff seeking documents about director independence "must give the court credible grounds to justify an inspection"); *Hoeller v. Tempur Sealy Int'l, Inc.*, 2019 WL 551318, at *9 (Del. Ch. Feb. 12, 2019); *cf. Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *4-5 (Del. Ch. Jan. 5, 2012) (finding that a stockholder could obtain books and records for the purpose of investigating whether the board could impartially consider a demand because the stockholder set forth a credible basis to infer waste or mismanagement).

[117] JX 19 at 4.

"It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[118] But "a bare allegation of possible waste, mismanagement, or breach of fiduciary duty, without more, will not entitle a stockholder to a Section 220 inspection."[119] "[A] stockholder seeking to investigate wrongdoing must show, by a preponderance of the evidence, a credible basis from which the court can infer there is 'possible mismanagement as would warrant further investigation.'"[120] This burden, though the lowest standard of proof in our law, is neither "a formality"[121] nor "inconsequential."[122] A stockholder must present "some evidence to suggest a credible basis for wrongdoing."[123] Simeone has failed to do so.

The plaintiff's theory is that Disney's "decision to express public opposition" to HB 1557 despite "the [G]overnor's warning" amounts to a possible breach of

---

[118] *Seinfeld*, 909 A.2d at 121.

[119] *AmerisourceBergen*, 243 A.3d at 426.

[120] *Id.* (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)).

[121] *Haque v. Tesla Motors, Inc.*, 2017 WL 448594, at *4 (Del. Ch. Feb. 2, 2017).

[122] *Amazon.com*, 2022 WL 1760618, at *6; *see also Sec. First*, 687 A.2d at 568 ("The threshold for a plaintiff in a Section 220 case is not insubstantial.").

[123] *Seinfeld*, 909 A.2d at 119; *see Sec. First*, 687 A.2d at 568 ("There must be some evidence of possible mismanagement as would warrant further investigation of the matter." (quoting *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 166 (Del. Ch. 1987))); *Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *6 (Del. Ch. Feb. 12, 2009) (explaining that a stockholder need not "prove mismanagement actually occurred, but must make 'a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing'" (quoting *Sec. First*, 687 A.2d at 568)).

fiduciary duty by the Board and certain Disney officers.[124] As a result of these actions, the plaintiff avers that Disney lost (or at least risked the loss of) rights and powers associated with the RCID.[125] He alleges that Disney's stock price dropped and that Disney "continues to suffer" financial harm because of its "aggressive position" on HB 1557.[126]

The plaintiff is not describing potential wrongdoing. He is critiquing a business decision.[127] "A stockholder cannot obtain books and records simply

---

[124] Compl. ¶¶ 1-2. The plaintiff's pre-trial brief suggests that he may also be interested in investigating corporate waste. This request was not raised in the demand or the Complaint. Had it been fairly presented, the argument would still fail because the plaintiff does not state anywhere in the record that Disney transferred a corporate asset of value for unreasonably small consideration. *See Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (defining waste under Delaware law as "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade").

[125] Compl. ¶¶ 1-2; JX 19 at 4-5.

[126] Compl. ¶¶ 23, 25. No evidence is cited to support the plaintiff's conjecture that Disney's stock price suffered because of its public stance on HB 1557. *See* Pl.'s Dep. 15-18. The only analyst report cited in the Complaint attributes Disney's decline in stock price to other factors, including losses from the Disney+ steaming service and a general sector decline across the media and entertainment industry. Compl. ¶ 22 (citing JX 26). The drop in stock price alone is an insufficient basis from which wrongdoing can be inferred. *See City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 2009 WL 3086537, at *8 (Del. Ch. Sept. 28, 2009) (stating that a plaintiff "must point the court to something other than a precipitous drop in stock price before Section 220 inspection rights may be granted"), *aff'd*, 1 A.3d 281 (Del. 2010).

[127] Pl.'s Dep. 64 ("Q. Okay. So your view is the company and its executives and officers used poor judgment in making this business decision to speak on this bill? A. Yes.").

because the stockholder disagrees with a board decision, even if the decision turned out poorly in hindsight."[128]

Although choosing to speak (or not speak) on public policy issues is an ordinary business decision, this case exemplifies the challenges a corporation faces when addressing divisive topics—particularly ones external to its business.[129] Individual investors have diverse interests—beyond their shared goal of corporate profitability—and viewpoints that may not align with the company's position on political, religious, or social matters. Yet stockholders invest with the understanding that the board is empowered to direct the corporation's affairs.[130] The board may

---

[128] *AmerisourceBergen*, 2020 WL 132752, at *9; *see also Seinfeld*, 909 A.2d at 120 ("The Court of Chancery properly noted that a disagreement with the business judgment of [the defendant's] board of directors . . . is not evidence of wrongdoing and did not satisfy [the plaintiff's] burden under section 220."); *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *8 (Del. Ch. Jul. 13, 2005) ("Stockholders cannot satisfy this burden merely by expressing a suspicion of wrongdoing or a disagreement with a business decision."); *Hoeller*, 2019 WL 551318, at *10 ("Disagreement with a business decision, in the absence of evidence from which the Court may infer a possible breach of fiduciary duty, does not create a credible basis from which the Court can infer mismanagement." (quoting *Marathon P'rs, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *7 n.40 (Del. Ch. Jul. 30, 2004))); *High River Ltd. P'ship v. Occidental Petroleum Corp.*, 2019 WL 6040285, at *5 (Del. Ch. Nov. 15, 2019) ("[D]isagreeing with a board's business judgment, without more, is not enough to provide a credible basis to infer mismanagement.").

[129] *See generally* Elizabeth Pollman, *The Making and Meaning of ESG* 1 (U. Pa. Carey L. Sch. Inst. L. & Econ., Research Paper No. 22-23), https://papers.ssrn.com/sol3/papers. cfm?abstract_id=4219857 (describing the "notable trend" of "integrating 'environmental, social, and governance' issues" into corporate governance as one of "the largest and most contentious debates in contemporary corporate and securities law").

[130] *See* 8 *Del. C.* § 141(a). Disney stockholders were on notice that the company would engage in political speech: "[Disney] believes that active participation in the political life of the communities in which we do business is in the best interest of the Company and its

25

delegate implementation to management, but it alone bears the ultimate responsibility for establishing corporate policy.[131]

Far from suggesting wrongdoing, the evidence here indicates that the Board actively engaged in setting the tone for Disney's response to HB 1557.[132] The Board did not abdicate its duties or allow management's personal views to dictate Disney's response to the legislation. Rather, it held the sort of deliberations that a board should undertake when the corporation's voice is used on matters of social significance.[133]

---

shareholders. As a result, we participate in public policy debates on many issues to support the Company's positions." JX 24 at '072; *see* The Walt Disney Company, *Political Giving and Participation in the Formulation of Public Policy in the United States* at 1 (July 2020), https://thewaltdisneycompany.com/app/uploads/2020/07/Political-Giving-and-Participation-in-the-Formulation-of-Public-Policy-2020.pdf.

[131] *See Grimes v. Donald*, 1995 WL 54441, at *8 (Del. Ch. Jan. 11, 1995) ("The board may not either formally or effectively abdicate its statutory power and its fiduciary duty to manage or direct the management of the business and affairs of th[e] corporation."), *aff'd*, 673 A.2d 1207 (Del. 1996).

[132] *See supra* notes 18-20 & 28-30 and accompanying text.

[133] *See* Leo E. Strine, Jr., *Good Corporate Citizenship We Can All Get Behind? Toward a Principled, Non-Ideological Approach to Making Money the Right Way*, 78 Bus. Law. 329, 366 (2023) ("If the company purports to take positions on external public policy, its positions should result from a deliberative process of the board of directors based on the direct relevance of the policy question to the company, and not just reflect the personal view of the CEO without board backing."); Lucian A. Bebchuk & Robert J. Jackson, Jr., *Corporate Political Speech: Who Decides?*, 124 Harv. L. Rev. 83, 87-89, 101-102 (2010) (observing that existing law treats "a corporation's decision to engage in political speech [a]s governed by the same rules as ordinary business decisions" and advocating for additional protections, such as requiring independent directors to approve or oversee decisions about corporate political speech given the potential for diverging interests vis-à-vis stockholders).

As Chapek told stockholders during Disney's 2022 annual meeting, the company's original approach to HB 1557 "didn't quite get the job done."[134] The company, facing widespread backlash from its staff and creative talent, changed course after the full Board held a special meeting about "Political Engagement and Communications."[135] The Board discussed "the communications plan, philosophy and approach regarding Florida legislation and employee response."[136] Only then did Chapek announce that Disney opposed the bill.[137]

The Board's consideration of employee concerns was not, as the plaintiff suggests, at the expense of stockholders. A board may conclude in the exercise of its business judgment that addressing interests of corporate stakeholders—such as the workforce that drives a company's profits—is "rationally related" to building long-term value.[138] Indeed, the plaintiff acknowledges that maintaining a positive

---

[134] JX 10.

[135] JX 24 at '052-055.

[136] *Id.* at '052 (noting that Chapek responded to questions from the Board about the topic). The Board discussed the issue again on March 9 after Chapek announced Disney's opposition to HB 1557. *Id.* at '055 (reflecting that the Board members made comments and asked questions).

[137] *See supra* notes 21-25 and accompanying text.

[138] *Revlon Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) ("A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders."); *see also Paramount Commc'ns v. Time, Inc.*, 1989 WL 79880, at *7 (Del. Ch. July 14, 1989) (noting that though the record suggested directors acted out of concern "for the larger role of the enterprise in society," there was an "insufficient basis to suppose . . . that such concerns ha[d] caused the directors to sacrifice or ignore their duty to seek to maximize in the long

relationship with employees and creative partners is crucial to Disney's success.[139]

It is not for this court to "question rational judgments about how promoting non-stockholder interests—be it through making a charitable contribution, paying employees higher salaries and benefits, or more general norms like promoting a particular corporate culture—ultimately promote stockholder value."[140]

The plaintiff has not put forth any legitimate basis to question the Board's impartiality in responding to the legislation.[141] He argues that Disney's directors were motivated by personal beliefs because "several Board members are actively involved with 'political organizations such as the Human Rights Campaign'" that "adamantly opposed" HB 1557.[142] That some directors may be involved with a non-

run financial returns to the corporation and its stockholders"), *aff'd*, 571 A.2d 1140 (Del. 1989); *Time*, 571 A.2d at 1150 ("[D]irectors, generally, are obliged to chart a course for a corporation which is in its best interests without regard to a fixed investment horizon."); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 37 (Del. Ch. 2013) ("[T]he duty of loyalty . . . mandates that directors maximize the value of the corporation over the long-term for the benefit of [stockholders]."); Edward B. Rock, *For Whom is the Corporation Managed in 2020? The Debate Over Corporate Purpose*, 76 Bus. Law. 364, 379 (2021) ("[I]n managing the business, the board of directors may consider the interests of other stakeholders, so long as there is some 'rational relation' to shareholder value.").

[139] Pl.'s Dep. 26-28, 46-47.

[140] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010).

[141] *Cf. Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *11 (Del. Ch. Jan. 25, 2019) (concluding that the plaintiff had put forward a credible basis to investigate potential wrongdoing, despite the fact that a single-bidder process "may be within the ambit of reasonable Board determinations for a merger," because the plaintiff "sufficiently portray[ed]" the process as "infected and spurred by self-interest and conflicts").

[142] Compl. ¶ 38 (quoting JX 19 at 4).

profit organization does not itself create a conflict of interest—much less undermine the full Board's deliberative process.  In any event, there are no facts in the record to infer that the directors' personal beliefs caused them to act contrary to the interests of Disney and its stockholders.[143]  The plaintiff cannot obtain books and records to search for hypothetical conflicts.[144]

I also find deficient the plaintiff's argument that the Board "ignored a known risk" of negative consequences from opposing the legislation.[145]  Perhaps the Board could have avoided political blowback by remaining silent on HB 1557.  At the same time, doing so could have damaged the company's corporate culture and employee

---

[143] Disney's initial silence also undercuts the plaintiff's theory.  So does the plaintiff's own testimony that he has no reason to believe any Board member (including Chapek) acted out of self-interest when Disney made comments about HB 1557.  Pl.'s Dep. 63.

[144] The plaintiff seeks director independence questionnaires to "determine whether any Disney [d]irector is beholden to an outside organization that might influence that director to oppose legislation, when the result of that opposition would be detrimental to Disney and its stockholders."  Pl.'s Opening Pre-trial Br. (Dkt. 18) at 30.  But "[c]uriosity is an insufficient reason to grant stockholders access to documents—particularly those that might include personal information about topics such as a director's finances or family." *Amazon.com*, 2022 WL 1760618, at *10; *see Hoeller*, 2019 WL 551318, at *9 (explaining that where a "demand seeks information regarding board interest or conflicts and yet nothing he has presented by way of evidence (or argument) provides a credible basis to suspect that [] fiduciaries were conflicted," the request will be denied); *see also Seinfeld*, 909 A.2d at 120 (stating that inspection is not appropriate where the demand is made "merely on the basis of suspicion or curiosity").

[145] Pl.'s Opening Pre-trial Br. 26.

29

morale. The weighing of these key risks by disinterested fiduciaries does not evidence a potential lack of due care, let alone bad faith.[146]

Moreover, even if a board's defiance of a political threat could provide a credible basis to suspect wrongdoing, there is no factual support for that conclusion here.[147] Neither the Complaint nor any of the sources relied on by the plaintiff demonstrate that Disney was warned of financial repercussions or dissolution of the RCID before Chapek's March 9 announcement.[148] According to the Complaint, it was not until March 30—three weeks after Disney first publicly opposed HB 1557 and two days after its March 28 statement—that the specter of dissolving the RCID was explicitly raised.[149]

---

[146] *See Hoeller*, 2019 WL 551318, at *10 ("When a business decision or strategy forms the basis of a Section 220 demand, and the stockholder proffers as his purpose for inspection a desire to investigate a possible breach of the duty of care, he must present some credible basis to suspect that the corporation's fiduciaries acted with gross negligence. And a poorly formulated or executed . . . strategy, without more, does not a gross negligence claim make.").

[147] *See Matthes v. Checkers Drive-in Rests., Inc.*, 2001 WL 337865, at *6 (Del. Ch. Mar. 28, 2001) (denying inspection where the plaintiff's assertions of wrongdoing were "without factual support").

[148] The threats during this earlier period were vague. *See supra* notes 26 & 53 and accompanying text.

[149] Compl. ¶¶ 13-14; *see supra* note 44 and accompanying text; *see also* JX 18 (reflecting that Disney was told public opposition would "not . . . work out well"); JX 48 at 191, 194, 199 (suggesting that Disney was encouraged to stay silent and was ultimately blindsided by legislation to repeal the RCIA).

At bottom, the plaintiff disagrees with Disney's opposition to HB 1557.[150] He has every right to do so. But "disagreement with [a] business judgment" is not "evidence of wrongdoing" warranting a Section 220 inspection.[151] Such an inspection would not be reasonably related to the plaintiff's interests as a Disney stockholder; it would intrude upon the "rights of directors to manage the business of the corporation without undue interference."[152]

## C.    Whether the Plaintiff Has Proven He Lacks Essential Information

Even if the plaintiff had demonstrated a proper purpose, no further inspection would be warranted. The plaintiff has not met his "burden of proving that the

---

[150] *See* Pl.'s Dep. 31 ("Q: So at bottom what it boils down to is you disagree with Disney's decision to speak about HB 1557 because you believe that was not in the best interest of stockholders?  A: Correct, yes.").

[151] *Seinfeld*, 909 A.2d at 120; *see supra* note 128 (citing cases).

[152] *Seinfeld*, 909 A.2d at 122 ("The evolution of Delaware's jurisprudence in section 220 actions reflects judicial efforts to maintain a proper balance between the rights of shareholders to obtain information based upon credible allegations of corporation mismanagement and the rights of directors to manage the business of the corporation without undue interference from stockholders."); *see also Hoeller*, 2019 WL 551318, at *1 ("The right to inspection is qualified out of considerations that are practical rather than equitable; if a stockholder were permitted to inspect records . . . to satisfy a desire to oversee matters properly within the province of corporate management or the corporate board, a considerable expense and distraction would be foisted upon the company . . . with likely little value in return."); *Everett v. Hollywood Park, Inc.*, 1996 WL 32171, at *5-6 (Del. Ch. Jan. 19, 1996) (rejecting demands to investigate business judgments where the plaintiff failed to present a credible basis from which the court could infer waste or mismanagement).

31

information [in the records sought] is essential to that purpose, taking into account the books and records [the company] has previously furnished."[153]

"Formal board-level documents are often the beginning and end of a Section 220 production where a plaintiff aims to investigate" potential mismanagement.[154] Disney has repeatedly represented that it produced all Board-level materials related to HB 1557, Disney's response to the legislation, the potential loss or modification of the RCID, and Disney's policies on charitable and political giving.[155] Still, the plaintiff maintains that he needs three years of email and correspondence "between and among Board members and CEO Chapek" about the same topics.[156]

The Delaware Supreme Court has instructed that "the Court of Chancery should not order emails to be produced when other materials (e.g., traditional board-level materials, such as minutes) would accomplish the petitioner's proper

---

[153] *Espinoza v. Hewlett Packard Co.*, 32 A.3d 365, 372 (Del. 2011).

[154] *Amazon.com*, 2022 WL 1760618, at *13; *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 790 (Del. Ch. 2016) ("The starting point—and often the ending point—for a sufficient inspection will be board level documents evidencing the directors' decisions and deliberations, as well as the materials that the directors received and considered."), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

[155] *See* Def.'s Pre-trial Opening Br. (Dkt. 17) at 15-16, 32-34; Def.'s Pre-trial Answering Br. (Dkt. 23) at 15.

[156] Pl.'s Pre-trial Opening Br. 30. As previously discussed, the plaintiff has not demonstrated his entitlement to director questionnaires. *See supra* note 144 and accompanying text.

purpose."[157]  A deviation from this typical approach is not merited here.  The Board

maintained formal records of its actions, and the relevant records were provided to

the plaintiff.[158]

The request for three years of documents is also "vastly overbroad."[159]  The

plaintiff wishes to investigate Disney's response to one piece of legislation that was

introduced and passed in 2022.  That aside, the point is moot.  Disney has confirmed

that no other Board-level documents on these subjects exist.[160]

The plaintiff also contends that Disney's production is incomplete because the

Board minutes it produced were redacted.[161]  The parties agreed that Disney could

redact portions of documents that were not responsive to the demand.[162]  Irrespective

---

[157] *KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 752-53 (Del. 2019).

[158] *See id.* at 758 (explaining that the production of email in a Section 220 action may be appropriate where the company "conducts formal corporate business without documenting its actions in minutes and board resolutions or other formal means"); *see also In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *5 (Del. Ch. Aug. 8, 2017) (declining to order the production of emails because board-level materials were sufficient to establish that the board was informed of the relevant facts); *Sec. First*, 687 A.2d at 570 (noting that Section 220 actions "are not the same and should not be confused" with Rule 34 discovery requests).

[159] *Amazon.com*, 2022 WL 1760618, at *13 (concluding that a request for records spanning a period more than three times longer than the events at issue was "vastly overbroad").

[160] *See Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *9 (Del. Ch. Oct. 19, 2001) ("[I]f the records to which the Court has found the Plaintiffs are entitled do not exist, the Defendant has no duty to do the impossible.").

[161] Pl.'s Opening Pre-trial Br. 14-15, 31-32.

[162] PTO ¶¶ 13-14.

of this agreement, irrelevant information cannot be "essential" to the purpose of the demand.[163]

Disney's redactions for responsiveness covered text that was also withheld as attorney-client privileged. At the plaintiff's request, Disney provided a log detailing its privilege redactions.[164] This privilege log not only substantiates Disney's privilege assertions. It also reflects that the redacted entries concern irrelevant matters: discussions about stockholder correspondence, ongoing litigation or regulatory matters that predate the passage of HB 1557, or privileged discussions concerning the directors' duties and rules as a general matter.[165]

---

[163] *Espinoza*, 32 A.3d at 371-72; *see Amazon.com*, 2022 WL 1760618, at *13 ("[R]edactions to material unrelated to the subject matter of a demand are proper because Section 220 only entitles a stockholder to information essential to accomplishing its stated purposes for inspection."); *Plains All Am. Pipeline*, 2017 WL 6016570, at *1 (permitting a defendant to redact non-responsive information from a Section 220 production); *see also* Def.'s Answering Pre-trial Br. 17 n.4 ("To be clear, the redacted content concerns other issues that the Board addressed during its meetings that had nothing to do with HB 1557."). The plaintiff argues that Disney should produce unredacted versions of the minutes because the minutes reference Disney's "approach to Florida legislation." JX 24 at '055. Board minutes routinely cover a variety of topics. A stockholder is not permitted to review information about every subject discussed during a board meeting just because one portion of the minutes covers a topic relevant to the stockholder's demand.

[164] *See* JX 44.

[165] *Id.* Because the material is irrelevant, the plaintiff's reliance on the *Garner* doctrine is misplaced. *See* Pl.'s Opening Pre-trial Br. 31-32; *see also Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1279-80 (Del. 2014) (noting that "the Court of Chancery properly first made the predicate Section 220 finding that the privileged information was necessary and essential before it then applied the *Garner* doctrine"); *KT4 P'rs v. Palantir Techs., Inc.*, C.A. No. 2017-0177-JRS, at 6, 9-10 (Del. Ch. Dec. 19, 2020) (TRANSCRIPT) (observing that a plaintiff must first establish that the

The plaintiff therefore has all necessary and essential information.  He would not be entitled to additional books and records had he prevailed on the other elements of his claim.

### D.    Whether the Plaintiff May Depose a Disney Witness

Finally, the plaintiff asks that Disney be ordered to produce a Rule 30(b)(6) deponent to testify about "what type of documents exist, where they are located, and whether Disney is asserting any privilege."[166]  He has not demonstrated why a deposition would be proportionate to the needs of this case.[167]

"Books and records actions are not supposed to be sprawling, oxymoronic lawsuits with extensive discovery."[168]  "[T]he discovery obligation typically confronted by the corporate defendant is relatively minimal" and "has been described as 'narrow in purpose and scope.'"[169]  A deposition of a corporate

---

material sought is necessary and essential to a proper purpose, and then show good cause under the multi-factor *Garner* test).

[166] Pl.'s Opening Pre-trial Br. 34; *see* Dkt. 13.

[167] *See Giarratano v. L Brands, Inc.*, C.A. No. 2020-0437-JRS, at 51-57 (Del. Ch. Sept. 22, 2020) (addressing the need for proportionality in discovery in a Section 220 action); *cf. Wal-Mart Stores*, 95 A.3d at 1282-84 (discussing Rule 30(b)(6) depositions ordered by the Court of Chancery pertaining to discovering the locations of documents that could reside across multiple offices worldwide).

[168] *Palantir Techs.*, 203 A.3d at 754.

[169] *Ravenswood Inv. Co. LP v. Winmill & Co., Inc.*, 2013 WL 396178, at *2 (Del. Ch. Jan. 31, 2013) (rejecting a plaintiff's request to depose the defendant's directors) (quoting *U.S. Die Casting and Dev. Co. v. Sec. First Corp.*, 1995 WL 301414, at *3 (Del. Ch. Apr. 28, 1995)); *see* Edward P. Welch et al., *Mergers and Acquisitions Deal Litigation Under Delaware Law* § 7.01[J][2], at 7-43 to 7-45 (Supp. 2022-2).

representative in a books and records action is not a matter of right.[170]  It is particularly uncalled for in this case since the plaintiff did not prove a proper purpose.

## III.   CONCLUSION

For the reasons described above, I decline to grant the plaintiff's request for a further inspection of Disney books and records.  Judgment will be entered for the defendant.

---

[170] *See N. Gold Hldgs., LLC v. REM EQ Hldgs., LLC*, C.A. No. 2022-0308-LWW, 2022 WL 4220426, at cmts. (Del.Ch. Sep. 12, 2022) (ORDER) (rejecting a request for a Rule 30(b)(6) deposition where the plaintiff had "not articulated a present need for a deposition on what documents exist" given the company's offer to produce responsive materials).